IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| TALESHA JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:22cv283-MHT |
| | ) | (WO) |
| ALFA MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Talesha Jordan brings this
employment-discrimination lawsuit against defendant Alfa
Mutual Insurance Company asserting that she was
terminated due to both racial discrimination and
retaliation for prior complaints of discrimination and
retaliation. She brings her race-discrimination claim
under 42 U.S.C. § 1981 and her retaliation claim under
§ 1981 and Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. §§ 1981a and 2000e through 2000e-17.
She seeks declaratory and injunctive relief and damages.
The court has jurisdiction under 28 U.S.C. § 1331

(federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

Pending before the court is Alfa's motion for summary judgment. For the following reasons, the motion will be granted as to the race-discrimination claim and denied as to the retaliation claim.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party," summary judgment is appropriate. *Id.*, 475 U.S. at 587.

## II.  FACTUAL BACKGROUND

The facts, taken in the light most favorable to Jordan, the non-movant, are as follows.

Jordan, who is Black, began working for Alfa in 2006. Throughout her employment, she worked in the billing department as a billing representative.[1]  For about 13 years, until 2019, she never received a disciplinary action.

Shortly before January 2019, the billing department began working with a new computerized system called Guidewire to enter certain data, including policyholders' information and payment methods. Within Guidewire was a program called Footprints.  When Alfa employees emailed questions to the billing department, the emails were converted into "tickets" in Footprints.  Billing

---

1. Jordan's job title changed at some point from billing clerk to billing representative, but this was not a change in position.

3

representatives were responsible for assigning themselves tickets to resolve. Sometimes the tickets could be resolved immediately, and other times, because representatives needed to get information from another source, it might take days or more to resolve them. Billing representatives were also responsible for answering phone calls from Alfa agents in the field. The phone system routed calls to members of the billing department. Billing representatives were expected to juggle handling calls and tickets and to handle a combined total of about 50 matters a day.

In January 2019, Susan Baugh, who is Caucasian, became the supervisor of the billing department. Baugh recognized that everyone in the department needed training on the new computer system. She created "workflows" to teach employees how to handle certain functions in the system, and shared these workflows in meetings with the billing department and in emails. She also decided to create a new position of billing analyst,

promote some employees to that position, and train these employees first, then have the billing analysts train the billing representatives. She gave the first promotions in March 2019, and others later that year.

After Baugh took over, Jordan requested a meeting with her to tell her about a problem with the call rotation that started under her prior supervisor and resulted in her receiving far more calls than other department employees.[2] After that meeting, Baugh determined that the call system had been programmed to make Jordan receive more calls than other billing department employees. Baugh changed that setting so that Jordan would not receive more calls than the other billing employees logged into the phone system. However,

---

2. The court notes that Baugh admitted in her deposition that Jordan told her she felt there was racial motivation in the decisions that her prior supervisor made. *See* Baugh Depo. (Doc. 32-2) at 45:11-46:3. As Jordan does not cite this testimony, the court will not rely on it. Baugh later attested that Jordan never mentioned race in any discussion she had with her. *See* Baugh Decl. (Doc. 32-5) at 2, para. 7.

while Jordan routinely logged into the phone system, many of her colleagues frequently did not do so. As a result, Jordan continued to receive more calls than other billing department employees.

### A. First Internal Complaints and Suspension

In April 2019, Jordan complained to Baugh and Baugh's supervisor, Kevin Lawrence, that Black billing representatives were being treated unfairly in that they were being required to answer more phone calls than the Caucasian representatives and were not able to get the same training as the Caucasian representatives.

Early the following month, on May 8, 2019, Baugh suspended Jordan for an interaction with a Caucasian billing analyst who was supposed to train Jordan. Baugh says that Jordan was rude to the billing analyst and acted disruptively afterwards. Emails from two department employees supported Baugh's version of events. According to Jordan and another coworker, who shared her

views with Baugh, Jordan did not act rudely or disruptively.

On the day of the incident, Lawrence called Jordan into an office with Baugh and told her she had been disruptive. Jordan told them that the billing analyst had been rude to her and that Black employees were being treated unfairly. Lawrence cut her off and told her she was suspended. Jordan told Lawrence and Baugh that the reasons for her suspension were false. They told her the matter would be investigated, but she never heard anything about an investigation taking place.[3]  Jordan was suspended for three days without pay.

### B. First EEOC Charge and Subsequent Events

―――――――――――――

3. Jordan actually attested that no investigation occurred, and no one who was present during the incident was ever interviewed, but it is unclear how she could be sure of this. *See* Jordan Decl. (34-1) at 1, para. 4. The court draws the reasonable inference from her statement that she did not hear about an investigation taking place.

On September 27, 2019, Jordan filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC), asserting, among other things, that she was being discriminated against due to race in having to handle more phone calls than Caucasian employees and regarding training, and that she had been suspended in May after complaining of race discrimination.

After filing the EEOC charge, Jordan told a Black billing analyst that she had done so. The billing analyst says that, after the EEOC charge was filed, Baugh appeared to monitor Jordan more closely than before. Also, Jordan showed the billing analyst emails Baugh had sent her about errors she had made. According to the billing analyst, everyone in the department regularly made errors because they were still learning the new Guidewire/Footprints system, and the emails were about errors everyone in the department made. Baugh never sent the billing analyst emails when she made the same errors.

A little over a month after she filed the EEOC charge, on November 1, 2019, Jordan received an "M-" grade on a performance evaluation.  The evaluation noted that Jordan needed to work on maintenance activities and stated that, "She was offered training multiple times this year and would not work with those that her supervisor assigned to help her." Evaluation (Doc. 32-1) at 115.  Jordan denies that she repeatedly rejected training opportunities and testified that the person who was supposed to train her spent a lot of time off of work and repeatedly left early or was sick when she was scheduled to train Jordan.  *See* Jordan Depo. (Doc. 32-1) at 60:22-62:10.

Due to the evaluation, Jordan received a reduced bonus for the first time, and went to Baugh to talk about it.  When Baugh said it was due to her evaluation and the incident in May, Jordan told her she felt like she was being retaliated because of her EEOC charge, which she had filed a couple months earlier.  *See* Jordan Depo.

9

(Doc. 32-1) at 136:13-137:8. Baugh told her, "Well, the main thing is, you know, you've got to work on your interdepartmental relationships," and laughed. *Id.* at 137:11-13. When Jordan pointed out that all of her evaluations from five other supervisors said that she got along well with her team, Baugh responded that she did not come to the parties and the social activities in the department during lunches and breaktimes, and that this would affect her bonus. *See id.* at 137:11-22.

### C. Second EEOC Charge, Suspension, and Internal "Retaliation" Complaint

On March 5, 2020, Jordan filed another EEOC charge asserting race discrimination and retaliation. The charge complained of being forced to handle more calls than Caucasian employees, being denied a promotion to billing analyst, and receiving a lowered performance evaluation and the attendant loss of bonus pay. Baugh learned about this second EEOC charge sometime before

July 21, 2020.  *See* Def.'s Resp. to Pl.'s First Request for Admissions (Doc. 34-4) at 2.

In June, Baugh asked Jordan to train a Caucasian billing representative on her job duties.  Baugh told Jordan she wanted him to be able to cover Jordan's duties when she was out.

According to Baugh, Alfa could not audit Jordan's handling of the electronic funds transfers (EFT) agreements due to Jordan's use of the wrong dropdown item in Guidewire until early June 2020, when she talked to Jordan about the issue.  That month, Alfa was able to audit Jordan's handling of EFT agreements.  The audit found that Jordan had not followed the correct procedure on 46 occasions that month.

Lawrence later told Jordan she was the only employee in the billing department who was audited at that time. It was not the typical protocol to audit only one employee at a time, and Baugh said that all employees were audited monthly.

11

Also, at the same time, a sample of tickets taken from the billing department showed that Jordan had not completed two tickets within five business days of the tickets' addition to the queue. *See* Audit Doc. (Doc. 32-2) at 83.

On July 21, 2020, Jordan was called into a meeting with Baugh and Lawrence and suspended for five days. They said the suspension was based on Jordan's failure to image 46 ETF authorizations and to work tickets within the required five-business-day window. Jordan told them she felt the suspension was retaliation, but did not specify for what. Baugh gave Jordan a second supervisor's report that warned her that failure to follow department procedures would result in termination.

The employee whom Jordan had trained in June covered for her duties while she was on suspension.

## D. Termination

12

Jordan returned to work around July 28, 2020. While she was on suspension, another employee had placed a credit on the wrong account.  On August 3, Baugh received an email that an unnamed billing department member had transferred the credit to the correct account, but failed to first void the erroneous credit from the wrong account, which left a negative balance in the account. Baugh had trained the staff on how to properly handle such transfers in June 2020. Baugh emailed Jordan informing her about the error on August 4, 2020. A few hours later, Jordan was called into a meeting with Baugh and Lawrence and terminated. Baugh did not talk about this error when she terminated Jordan.

After her termination, Jordan's former position was filled by another Black person.

### III.  DISCUSSION

13

Alfa moves for summary judgment on all claims. The court will first discuss the race-discrimination claim and then the retaliation claim.

### A. Race Discrimination

Jordan claims that that Alfa violated her rights under 42 U.S.C. § 1981 by terminating her employment due to her race. "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). A plaintiff asserting a claim of race discrimination under § 1981 "bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020); *see also Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023).[4]   In other words, a

_____

4. The parties agreed at the pretrial conference that Jordan had to prove that race was only a 'motivating factor' in her termination.  However, the motivating

14

race-discrimination plaintiff proceeding under § 1981 must show that the defendant would not have taken the challenged adverse action if her race were different.

Jordan has no direct evidence of racial discrimination. She instead seeks to prove her claim with circumstantial evidence. The court must determine whether there is "enough evidence for a reasonable factfinder to infer intentional discrimination." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946-947 (11th Cir. 2023).

Alfa contends that Jordan was terminated for committing a workflow violation by failing to void a refund prior to moving money--resulting in an account

---

factor test applies to only discrimination claims brought under Title VII. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) (explaining that under Title VII, "[i]t suffices ... to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."). Because Jordan proceeds on her race claim under § 1981 rather than Title VII, Jordan cannot succeed unless she proves she would not have been terminated but for her race.

15

having a negative balance, and contradicting workflow instructions provided most recently less than two months previously--after her behavior and performance had necessitated two prior suspensions and after she had been warned that failure to follow departmental work procedures would result in termination. Jordan argues that this reason was pretextual and that the real reason she was terminated is her race.

Jordan contends that the evidence shows she was not responsible for the failure to void the refund. She argues that the email's failure to identify the person who made the error is evidence that Baugh falsely attributed the error to her. She also attests that several people could have worked on the ticket at the same time and that that someone else could have made the error. She adds that, during the termination discussion, Baugh did not mention this error.[5] Finally, she swears

_____

5. Baugh had emailed Jordan about the purported error a few hours prior to her termination. There is no

that, "Whenever I transferred a credited payment from one account to another, ... I always made sure I did what I was supposed to do to get the misapplied credit voided." Jordan Decl. (Doc. 34-1) at 2, para. 7.

"An employee may demonstrate pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983) (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). However, in attacking the credence of an employer's explanation, a plaintiff cannot simply challenge the wisdom of the explanation. *See Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1324 (11th Cir. 2023). An employer may discipline an employee "for a good reason, a bad reason, a reason based on erroneous facts,

---

evidence that Alfa required its managers to give a full explanation of reasons before terminating an employee.

or for no reason at all, as long as its [decision] is not for a discriminatory reason." *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). It is now hornbook law that, "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotation and citation omitted). A factfinder cannot merely substitute its or the plaintiff's business judgment for that of the employer.

Here, in support of her race-discrimination claim, all that Jordan has done with the above arguments is challenge the wisdom of Alfa's decision to terminate her; she contends that she was not responsible for failures attributed to her. Even if Alfa were wrong in terminating Jordan, that error in judgment, standing alone, would not be sufficient for a jury to conclude that she was a victim

of *race* discrimination.[6] Section 1983 does not prevent employers from making errors in judgment.

Jordan also argues the evidence shows that the first two suspensions were unfounded.    According to Alfa, Jordan's first suspension was due to Jordan's rudeness

_____

6. Jordan attacks a statement in Alfa's brief that "a member of the Development Team notified Ms. Baugh that Plaintiff had failed to void a refund prior to moving money."    Jordan argues that this statement was false, pointing out that, contrary to the statement, the email Baugh received about the failure to void did not name the person who made the error; instead, that person is referred to only as "billing user." August 4, 2020 Emails (Doc. 32-1) at 167.    Jordan also points to her own sworn statement that nothing in the email showed that she had made the error on the ticket or even worked on it, and that several people could have handled aspects of ticket at the same time. *See* Jordan Decl. (Doc. 34-1) at 2, para. 7.

While Jordan is correct that the statement in the brief was inaccurate, it was a statement by counsel describing evidence (albeit inaccurately), not a direct quote from Baugh.    The evidence shows that Baugh received an email from a member of the development team about the error and attributed that error to Jordan.    How Baugh reached that conclusion is not explained, but the court sees no evidence that Baugh ever said that the email explicitly informed her that Jordan had made the error. The inaccuracy of counsel's summary of Baugh's testimony does not prove that Baugh's actions were pretextual for race.

19

to billing analyst Jenny Olander when Olander came to train her, as well as Jordan's alleged disruptive behavior after the incident. Baugh admittedly did not hear what Olander said before Jordan spoke, but says she heard Jordan tell Olander in a rude tone, "I will handle tickets as I see fit." Alfa also presented evidence that a Caucasian employee informed Baugh that, after Olander left, Jordan said, seemingly to no one in particular, something to the effect of "these people are crazy" and that she might have to kick some "as$", and that she slammed things on her desk. In her writeup of the suspension, Baugh also claimed that Jordan had approached her aggressively the day before about another matter.

Jordan does not deny the episode with Olander happened but instead takes issue with Baugh's view of the event and certain details of Alfa's version of events. According to Jordan, Olander started the incident by approaching her rudely and stating loudly that she had skipped a ticket; Jordan then told Olander that, if she

20

was in the midst of answering the phones, then that came
first before working tickets, and that she "would 'have
to see fit' to answer the phones before working a ticket."
Jordan Decl. (Doc. 34-1) at 1, para. 4.  While this puts
a different spin on what happened, it does not vary
drastically from what Baugh claims to have heard.  Jordan
denies saying anything threatening to Olander or slamming
drawers, but she does not directly address the claim that
she said something threatening and was disruptive *after*
Olander left the area.  Jordan also submitted a statement
from a coworker who witnessed the incident with Olander
and opined that Jordan's behavior was not rude or
threatening.

That said, Jordan does deny the claim, included in
the supervisor's report from the incident, that she
approached Baugh aggressively on another recent occasion.
In her declaration, Jordan explained, "Susan [Baugh] ...
claimed that I had come to her desk in an aggressive
manner the day before complaining about someone from the

21

Marketing Resources Center coming to her about a matter I was working on and said that we could take it to Human Resources. This too was false. I had differences with Susan and the way she treated me and the other Black employees, but she was my supervisor and I always treated her with respect. I never raised my voice to her or got aggressive with her."  Jordan Decl. (Doc. 34-1) at 1, para. 4. Alfa does not rely on this allegation to justify Jordan's termination.

In sum, Jordan and Baugh strongly differ on what happened in regard to the Olander incident. But, again, this court is not a general forum for resolving personnel disputes. It may be that Alfa is right about what happened between Jordan and Olander; it may be that it is wrong. What is clear to the court is that, even if Alfa is wrong, the relevant evidence in the record, standing alone, would not be enough for a factfinder to conclude that Jordan was a victim of *race* discrimination.

As to the second suspension, Jordan argues that it was not warranted because she could not access the proper dropdown menu on her computer and it needed to be fixed; and because the five-business-day rule ran from when a ticket was taken from the queue, rather than when it was submitted to the queue. The record reveals that Baugh had sent an email to all billing department members, including Jordan, instructing them to "take special care when setting an account up on EFT." Nov. 12, 2019 Baugh Email (Doc. 32-5) at 6. The email had attached to it a document named "EFT Imaging Workflow" that explained that they "now have a drop down in footprints for 'authorization agreement'" and instructing, "When working a footprint to add or change EFT information, please use the above drop down." *Id.* at 7. The attachment further advised employees that, if they had any questions, they should see Baugh. *Id.* On the other hand, in June of the following year, according to Baugh, Jordan still was not using the proper dropdown. Baugh

23

testified that on June 3, 2020, she realized that Jordan could not be audited because she was using the wrong dropdown item, and she instructed her on what to do. Jordan testified that, when she received her suspension, the dropdown menu still did not work properly on her computer.

Jordan has also presented evidence that she was the only employee who was audited in June 2023 and that, during the same month, Baugh asked her to train a Caucasian coworker to cover for her when she was out. According to Jordan, this evidence shows that Baugh wanted to suspend or fire her and therefore targeted her with an audit and had her train her replacement.

As for the finding that on several occasions Jordan had violated the five-business-day rule on resolving tickets from the queue, Jordan argues that the rule was that tickets needed to be resolved within five days of pulling them from the queue, rather than five days from

their submission to the queue, as Baugh attested.[7]   As
support for this argument, she offers the testimony of a
former coworker who recalled that the time ran from when
the employee pulled the ticket from the queue.   Alfa
argues that the testimony can be considered as evidence
only of the employee's understanding of the rule, and
does not show that Baugh's understanding was different.
Moreover, Jordan presented no evidence that Baugh applied
the rule differently to Jordan than to others.

Jordan also attacks this reason for the suspension
by arguing that Baugh did not come across her violations
of the five-business-day rule through a random sample,
as claimed.   As support for this argument, Jordan notes
that nine of the 13 items sampled were her work, and
argues this could not have been random because there were
12 employees in the department.   This argument turns on

---

7. The written evidence of the rule that Alfa
produced left the proper interpretation of the rule
unclear.

statistical evidence, and "in an individual disparate treatment case, statistics may be relevant to establish that an employer's articulated reason for an employment action is pretextual." *Burney v. Rheem Mfg. Co.*, 196 F.R.D. 659, 667 (M.D. Ala. 2000) (Walker, M.J.) (emphasis added) (citing *McDonnell—Douglas Corp. v. Green,* 411 U.S. 792, 804—05 (1973) ("Other evidence that may be relevant to any showing of pretext includes ... petitioner's general policy and practice with respect to minority employment. On [this] point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks.")). Jordan has not presented any expert testimony applying the appropriate statistical analysis to the evidence and concluding that this result was impossible or highly unlikely absent discrimination.

In sum, Jordan and Baugh strongly differ as to whether Jordan should have been suspended a second time. But, again, this court is not a general forum for resolving personnel disputes.  It may be that Alfa is right about Jordan's conduct; it may be that Alfa is wrong.  What is clear to the court is that, even if Alfa is wrong, there is not enough evidence for a reasonable factfinder to conclude that, as to her second suspension, Jordan was a victim of *race* discrimination.

Admittedly, Jordan has presented evidence that, she contends, shows that Baugh otherwise disfavored Black employees in various ways.  Jordan argues that, though all employees in the department were supposed to answer the phones, "Baugh turned a blind eye to white employees shirking this duty throughout the time she supervised the department while Jordan was there while constantly harping on the Black employees to answer the phones." Pl.'s Brief (Doc. 35) at 14.  She further relies on the testimony of her former coworkers that Baugh treated them

27

and other Black employees in a racially discriminatory manner. The court will discuss the phone evidence then turn to the other claims of racially discriminatory treatment.

Jordan testified that she had to answer the phones more than other employees because the Caucasian employees routinely would not log on to the phone system, and Baugh let them get away with it. She also submitted evidence from two former coworkers that Baugh "stayed on the Black employees about being logged on" to the phone system to take incoming calls from customers, but did not do so with the Caucasian employees, though all employees were supposed to be logged on to take such calls; the result was that Black employees had to take more phone calls than the Caucasian employees. *See* Bell Declaration (Doc. 34-2) at 1, para. 3; Sharpe Declaration (Doc. 34-3) at 1, para. 3.

In rebuttal, Alfa points out that on several occasions, Baugh emailed all of the employees in the

department to log in to the phones.  In the testimony
that Alfa cites, Baugh testified that when Jordan brought
to her attention that other employees were not logged
into the phones, she would send an email to the department
urging others to log in to the phone system.  *See* Baugh
Depo. (Doc. 32-2) at 66:5-11.

Alfa also argues that the coworkers lacked sufficient
personal knowledge to state that Baugh "stayed on" Black
employees more than Caucasian ones. But the record
reflects that billing department employees worked in the
same area and could hear what was being said by others
in the office.  The coworker had sufficient personal
knowledge to describe what she saw and heard in the
office.  Applying the summary-judgment standard, the
court views the coworkers' statements as evidence that
they witnessed Baugh frequently reminding Black employees
to answer the phones but did not hear her do so with
Caucasian employees.  Of course, as Alfa points out, it

is unknown what Baugh said to Caucasian employees outside the hearing of these individuals.

Finally, Alfa argues that Black employees suffered no disadvantage in answering more phone calls. Common experience tells one that frequently answering phone calls is likely to interrupt one's ability to focus on other matters, which could interfere with an employee's ability to resolve tickets. Indeed, Jordan testified that answering calls interfered with her ability to do other work. *See* Jordan Depo. (Doc. 32-2) at 141:23-142:6 ("It was making, you know, making me stop work that I had to do on my desk to do calls that I should not have had to answer."). While Jordan was employed, there was an unwritten expectation that employees were supposed to resolve a combined 50 tickets and phone calls each day. *See* Baugh Depo. (Doc. 32-2) at 28:10-17. It is easy to see how an employee could subjectively view having to answer the phones more often than one's colleagues as a disadvantage.

In any case, the subjective and general testimony presented by Jordan regarding phone calls is not enough to show that Baugh discriminated against her or other Black employees in terms of *disciplinary actions or terminations*. Answering phones may have interrupted efforts to work on tickets, but Jordan has presented no evidence that Baugh punished her or any other employee for handling an insufficient number of tickets during the time Jordan was employed. The employees' subjective view that Black employees were required to answer the phone more than Caucasian ones therefore provides no basis for concluding that Baugh discriminated against Jordan in actually disciplining and terminating her.

Jordan also relies on the statements of two former coworkers who opined that Baugh favored Caucasian employees over Black employees and provided various examples--in addition to the phone issue--to support their opinions. According to one of the coworkers, Baugh appeared to monitor the Black employees more closely than

the Caucasian employees about not exceeding allowed time for breaks and staying on task, and Caucasian employees could overstay breaks without Baugh complaining. *See* Bell Decl. (Doc. 34-2) at 1, para. 3.

Alfa argues that the coworker does not have sufficient personal knowledge to make her statement because she cannot know what Baugh said to Caucasian employees outside of her presence. Taking the evidence in the light most favorable to Jordan, the reasonable inference from the coworker's statement is that the coworker heard Baugh checking on the timeliness of Black employees' returning from breaks and reminding the Black employees to stay on task more than she did with the Caucasian employees, and that she witnessed Caucasian employees returning from breaks late without Baugh saying anything to them that the coworkers could hear. However, the lack of detail about how often and how egregiously the various employees violated rules or went off task makes it difficult to draw any reliable conclusions from

the coworker's observations about Baugh's intent.[8]  But, more importantly, this evidence does not show that Baugh disciplined or terminated Black employees more than similarly situated Caucasian employees, such that a factfinder could conclude that Baugh *terminated and disciplined* Jordan because of her *race*.

Jordan also presented evidence that, during the COVID pandemic, Baugh allowed three Caucasian employees whose children were attending school online to work remotely but refused to allow a Black employee to do the same, even though she also had a young child who had to attend school remotely as well.  As a result, the Black employee had to take personal time off work and work late to deal with her child's schooling.  While it is possible that racial discrimination was at play in this decision,

_____

8. Moreover, the record does not establish how often the coworker was present and therefore able to view the interactions between Baugh and her Caucasian colleagues, and the coworker cannot know what communications Baugh had with the Caucasian employees outside of her hearing or by email.

without more information about each employee's job responsibilities and the circumstances of each request to work from home, this decision cannot be viewed as evidence that Baugh favored Caucasian employees over Black ones, and accordingly does not help prove that Baugh suspended and terminated Jordan due to her race.[9]

Similarly, evidence that Baugh failed to ensure that a Caucasian employee trained a Black employee is not sufficiently probative here of whether Jordan was suspended and terminated because of her race. As discussed earlier, a Caucasian employee, Olander, was supposed to provide a Black employee with training but would not do so. The Black employee brought this problem to Baugh's attention and asked her to talk with Olander about it, but Olander never provided the training. The

---

9. At oral argument, defense counsel represented that two of the employees who were allowed to work from home were billing representatives, while the denied employee was a billing analyst, and argued that this explained the difference in treatment. The court looked for evidence supporting this representation but could not find any in the summary-judgment record.

coworker admittedly does not know what Baugh did after being informed that Olander would not give the training; all she knows is that the training was not given. The record does not further clarify what Baugh did or did not do.

Finally, there is no evidence in the record that Baugh disciplined or terminated any other Black employee for any reason during her many years at Alfa, and it is undisputed that Baugh hired a Black employee to replace Jordan.[10] Thus, even assuming that the coworkers' testimony accurately reflects that Baugh showed favoritism towards Caucasian employees and bias towards

---

10. Baugh also twice offered a promotion to billing analyst to one of Jordan's Black coworkers. Of course, favorable treatment of other Black employees does not preclude a finding that Jordan was terminated because of her race. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race ... merely because he favorably treats other members of the employees' group."). However, Baugh's favorable treatment of other Black employees does tend to undermine Jordan's argument that Baugh harbored racial animus against Black people in general.

Black employees in certain regards, there simply is no
evidence of a pattern of racial discrimination against
Black employees in terms of discipline and termination.
This is not to say that an overarching or widespread
history of race discrimination can never be relevant in
determining whether a specific instance of discipline was
racially motivated; it is just that the instances
presented by Jordan are not adequate for a reasonable
factfinder to conclude that her specific suspensions and
termination were a product of racial bias. Considering
the record as a whole, Jordan has not presented
sufficient evidence for a reasonable jury to conclude
that Baugh would not have suspended and terminated her
but for her race.


## B. Retaliation

Jordan also argues that retaliation was the reason
for her termination. "Title VII's antiretaliation
provision forbids employer actions that 'discriminate

36

against' an employee ... because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that she engaged in statutorily protected activity, she suffered a materially adverse employment action, and causation. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  To establish causation, the plaintiff must show that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  On summary judgment, therefore, the plaintiff bears the burden of submitting sufficient evidence for a reasonable jury to find that she would not have been terminated absent retaliation for protected conduct.  For the following

37

reasons, the court finds that Jordan met that burden here.

First, it is indisputable that Jordan has shown she suffered a materially adverse-employment action in that she was terminated.

Second, Jordan has submitted evidence sufficient for a reasonable jury to find that she engaged in protected conduct on repeated occasions. It is undisputed that Jordan suffered an adverse-employment action when she was terminated on August 4, 2020. With the evidence viewed in the light most favorable to Jordan, she engaged in protected expression in April 2019 by complaining of race discrimination to Baugh and Lawrence; in September 2019 when she filed her first EEOC complaint; and in March 2020 when she filed her second EEOC complaint. Jordan also points out that, when she talked to Baugh in November 2019 about her reduced bonus, she told her she felt it was retaliation for her September EEOC complaint.

38

The parties disagree as to whether Jordan also engaged in protected expression by complaining of retaliation to Baugh and Lawrence when she was suspended on July 21, 2020. During the July meeting, Jordan says she told them the suspension was "retaliation," but she admittedly did not specify that she meant retaliation for her EEOC charges. Alfa argues that Jordan's accusation of retaliation was too general to constitute protected opposition conduct because Jordan did not specify that she felt she was being retaliated against for filing an EEOC charge. As support for this argument, Alfa relies on a case in which a plaintiff complained about unfair treatment compared to others but never indicated that the unfairness was connected to race, sex, another protected characteristic, or retaliation. *See Blow v. Va. Coll.*, 619 Fed. Appx. 859, 863 (11th Cir. 2015). Here, in contrast to *Blow*, Jordan complained about what she considered unfair treatment <u>and</u> said she felt it was a result of retaliation. While Jordan did not mention the

39

EEOC charge, Baugh had learned by the time of the suspension that Jordan had filed an EEOC complaint alleging race and retaliation discrimination in March. Moreover, Jordan had previously told Baugh that she felt her reduced bonus was a result of retaliation for her first EEOC charge.  Given these facts, a reasonable factfinder could conclude that, when Jordan said she was being punished as retaliation, Baugh likely understood Jordan's comment as relating to the more recent EEOC charge.[11]

---

11. Alfa argues, "While legal professionals may associate 'retaliation' with a prior protected complaint, to a lay person, the word could refer to an employer's reaction to any number of employee actions: heating up fish in the company microwave, wearing flip flops to work, failing to come to work on time, gossiping about a manager's private life, flirting with the manager's spouse, spending too much time talking to co-workers, etc." Reply Br. (Doc. 36) at 2.  But Baugh likely would have interpreted the retaliation comment in the context of what she actually knew Jordan to have done, not some hypothetical wrong. In any case, how Baugh, a layperson, likely interpreted the use of the word "retaliation" in this situation strikes the court as an issue for a jury, not a judge, to decide. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) ("[T]he weighing of the evidence, and the drawing of legitimate inferences

Jordan also has submitted sufficient evidence for a jury to conclude that she would not have been terminated absent retaliation for her protected conduct. First, the evidence shows a clear pattern of alleged protected activity followed by alleged negative actions. Jordan never faced any discipline for 13 years until she complained of race discrimination, and each time she complained, negative treatment followed not long after. While one instance of protected activity followed by negative action might not have been sufficient to survive summary judgment, this alleged pattern is.

Within a month or less of when she complained to Baugh and Lawrence about racially discriminatory treatment in April 2019, she was suspended for of behaving rudely and aggressively towards another employee, Olander.[12]  Shortly after Jordan filed her first

from the facts are jury functions, not those of a judge." (citation and internal quotation omitted)).

12. Alfa relies on emails Baugh received from other employees reporting that Jordan was rude and behaved

charge with the EEOC in late September 2019, Baugh started sending Jordan emails about mistakes she was making that other employees were also routinely making because they were getting used to a new system.  About a month later, Baugh gave Jordan a negative employment evaluation claiming she repeatedly refused training, which according to Jordan was not true.

When Jordan received a reduced bonus shortly thereafter and asked Baugh why, Baugh emphasized Jordan's need to come to informal celebrations in the office to improve her relationships with her colleagues, although doing so was not required.  Jordan had never been criticized for having negative relationships with her colleagues in the 13 years prior to Baugh's arrival. Jordan told Baugh she felt the reduced bonus was retaliation for her September 2019 EEOC charge.

---

disruptively. The emails appear to have been solicited by Baugh after a prior conversation, because they have none of the introductory language that would otherwise be expected on emails reporting misconduct to one's supervisor.

Jordan filed her second EEOC charge in March 2020. A few months later, Baugh asked Jordan to train another employee in her duties so he could cover her when she was out. Around the same time, Jordan was singled out for an audit. The following month, Baugh suspended Jordan for five days on the basis of the audit and her failure on two occasions to follow a rule requiring resolving tickets within five business days. Yet, according to Jordan, Baugh knew that Jordan's computer had problems that caused the problems with the EFT authorizations, but suspended her anyway. The employee Baugh had asked Jordan to train did cover her duties during her suspension.

At the July 21, 2020, meeting in which she received the suspension, Jordan told Baugh and Lawrence that she felt the suspension was retaliation. As discussed earlier, a reasonable jury could infer that Baugh knew she meant retaliation for the EEOC charge when Jordan claimed retaliation again. And, within a week or so of

43

when Jordan returned from suspension, Baugh sent Jordan an email accusing her of failing to void a credit in an account before transferring it to another account. It is unclear how Baugh determined that Jordan had made the error, as the identity of the person who made the error was not stated in the email notifying Baugh of the error. Jordan was always very careful to void transactions when she moved money between accounts. A few hours later, Jordan was terminated.

Admittedly, as explained above with regard to the race-discrimination claim, because the evidence that the disciplinary actions were in any way connected to Jordan's race was so weak that no factfinder could reasonably conclude that the actions were a product of race, the court concluded that the race-discrimination claim boiled down to a mere personnel dispute over whether the actions were warranted, and this court is not a forum for resolving such a dispute.

**44**

Here, in contrast, as explained above, the retaliation claim rests on evidence allegedly reflecting a pattern of protected activity followed by alleged negative actions; evidence that Jordan never faced any discipline for 13 years until she complained of race discrimination, and each time she complained, negative treatment followed not long after. This evidence draws into question whether retaliation played a role in the suspensions and termination Jordan suffered. And, as shown above, Jordan and Baugh have presented evidence hotly disputing whether the disciplinary actions were warranted. Whether retaliation played a role in Baugh's actions to the extent that but-for the retaliation she would not have taken the actions is for a jury to decide.[13]

_____

13. Alfa argues that Jordan cannot show that retaliation was a but-for cause of her termination because, several years later, Baugh fired another billing department employee for what it contends were the same reasons, and that employee had not filed an EEOC complaint. In reality, the reasons that Jordan and the other employee were terminated only overlapped in part. According to Baugh,

Of course, the jury may very well choose to
disbelieve Jordan's evidence and to believe the reasons
for termination that Alfa has presented.  While this
claim is a close one, the court finds that the evidence
in the record is sufficient for a reasonable jury to

---

> "Like Ms. Jordan, [the fired employee]... failed
> to image an excessive number of Authorization
> Agreements. He also provided insufficient
> answers to the field and had problems with
> productivity. I treated ...[his] violations the
> same way I did Ms. Jordan's; he received two
> Supervisor's Reports (the first in December 2021
> and a second in March 2022) and, when he
> continued to deviate from departmental
> guidelines, I terminated his employment."

Baugh Decl. (Doc. 32-5) at 3, para. 11.

Clearly, similarities exist between this employee
and Jordan in that both failed to image a significant
number of authorization agreements and that Baugh framed
both of their problems as a failure to follow guidelines.
But unlike Jordan, the other employee provided
insufficient answers when receiving calls from the field
and had problems with productivity. Given these
dissimilarities, Baugh's firing of second employee does
not prevent Jordan from showing that her termination
would not have occurred absent retaliation.  They are not
similarly situated in all material ways.

46

conclude that Jordan would not have been terminated absent retaliation.

## IV. CONCLUSION

For the above reasons, summary judgment will be granted in favor of Alfa and against Jordan on the race-discrimination claim.    However, the retaliation claim will go to trial.

DONE, this the 17th day of January, 2025.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE